## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| **MARCIA GRANT, et al.,** | * | |
| **Plaintiffs** | * | |
| **v.** | * | **Civil No.: 1:20-cv-02226-GLR** |
| **ATLAS RESTAURANT GROUP, LLC** | * | |
| **Defendant** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Marcia Grant and D.G., a minor on behalf of his mother, Marcia Grant (hereinafter collectively referred to as "Plaintiffs"), and by and through their attorneys, Joseph E. Spicer, Esquire, and Cohen Harris, LLC, Donte Mills, Esquire and Lennon Edwards, Esquire of Mills & Edwards, LLP, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 105.1, hereby files Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment. In support thereof, Plaintiffs state the following:

### A.  RELEVANT MATERIAL FACTS

On June 21st, 2020, Plaintiffs decided to take Marcia Hines (hereinafter referred to as "Hines") to the Ouzo Bay Restaurant (hereinafter referred to as "Ouzo Bay") to celebrate her fiftieth (50th) birthday. See Plaintiff Marcia Grant's Deposition, at 137:20-140:3, attached as Exhibit No. 1. Plaintiffs, who are African-Americans, entered Ouzo Bay as customers. *Id.* at 168:15-19; see also Video at 3:01-3:02, attached as Exhibit No. 2. At the time, D.G. was nine (9) years old. See Exhibit No. 1 at 12:18-19; see also Exhibit No. 2 at 1:32-1:33. After entering Ouzo Bay, Plaintiffs made a request to be seated where they were intending to dine. See Exhibit

No. 1 at 149:2-9; see also Exhibit No. 2 at 1:27-1:59. Prior to the day of the incident, Plaintiffs

had never been to Ouzo Bay before or to any of Defendant's restaurants. See Exhibit No. 1 at

139:2-6.  When Plaintiffs entered the restaurant to be seated, they were informed by an Ouzo

Bay manager that they would not be permitted to dine at the restaurant. *Id.* at 149:2-9.

Defendant's host informed Plaintiffs that Plaintiff D.G.'s attire did not meet the restaurant's

dress code. *Id.* Before Plaintiffs left the restaurant, Plaintiff Grant observed a white child

similarly dressed to Plaintiff D.G.  *Id.* at 162:7-12, 163:13-15; see also Exhibit No. 2 at 2:35-

2:39. D.G. and the white child were wearing shorts, graphic t-shirts, and tennis shoes. *Id.*

Plaintiff Grant asked Defendant's manager why the restaurant refused to serve Plaintiffs and why

it permitted the white child dine? See Exhibit No. 2 at 1:28-1:59, 2:23- 4:23. After Plaintiffs

informed the defendant's manager of the similarities in the clothing of Plaintiff D.G. and the

white child, Defendant still refused to allow Plaintiffs to dine at the restaurant. See Exhibit No. 1

at 167:1-3; 169:21-170:14; see also Exhibit No. 2 at 1:28-1:59, 2:23-4:23. Plaintiffs were not

permitted to dine at the Ouzo Bay Restaurant and were turned away. *Id.*

      Defendant applied different standards based on race in enforcing its dress code. When

Defendant's manager was explaining why he was denying Plaintiffs' service, he was inconsistent

in his explanation. See Exhibit No. 2. In fact, there were people in the restaurant who were

wearing the same or similar attire as D.G. *Id.* at 2:01-2:13. Defendant's application of these

differing standards in enforcing its dress code was noticed by some of Defendant's employees,

specifically, Jenna Burlakoti, Rafael Coppola, and Elizabeth Devine. See Jenna Burlakoti's

Declaration at ¶¶ 2-14, ¶¶ 23-25, attached as Exhibit No. 3; Rafael Coppola's Declaration at ¶¶

8-10, attached as Exhibit No. 4; and Elizabeth Devine's Declaration, at ¶¶ 11-16, attached as

Exhibit No. 5. Ms. Burlakoti, Mr. Coppola, and Ms. Devine observed Defendant enforce its dress

code in an unequal and racially discriminatory manner against black people. Defendant was advised by its employees of the racially discriminatory manner in which its dress code had been enforced. See Julie East's Deposition, at 114:1-115:10, attached as Exhibit No. 6.

Ms. Burlakoti met with Defendant's management about its dress code. See Exhibit No. 6 at 65:14-66:5. Ms. Burlakoti and another employee, Henry Walters, spoke with management about the Defendant's dress code and how it excluded people of color. *Id.* at 114:1-115:10; see also *Id.* at 71:8-72:11.

Mr. Walters was an employee of Ouzo Bay on the date of the incident. See Defendant's and Henry Walter's E-mail, attached as Exhibit No. 7. Mr. Walters contacted Defendant's management about the dress code. *Id.* Mr. Walters advised Defendant's management that it was obvious to him and Defendant's staff that the dress code enforcement was used to treat black people worse than white people. *Id.* Mr. Walters also indicated that the disparate treatment of black people occurred regularly and may be even on a daily basis at Defendant's restaurants. *Id.*

Defendant apologized to Plaintiffs for how it enforced the dress code against Plaintiffs on June 21st, 2020. See Defendant's Public Statement, attached as Exhibit No. 8. Defendant wrote in its public statement that the incident with Plaintiffs should never have happened. *Id.* Defendant's public statement also indicates that Plaintiffs should have been served. *Id.* As such, Defendant terminated Donald McCafferty's employment and agreed to a mutual separation with Eric Petit, because they failed to properly handle the matter with Plaintiffs. See Exhibit No. 6 at 56:11-57:8, 58:1-12. Julie East, Defendant's Vice-President of Human Resources, called Mr. Cafferty's and Mr. Petit's conduct with Plaintiffs "egregious". *Id.* at 28:2-7. In the aftermath of the incident with Plaintiffs, Defendant chose to revise its dress code. See Alex Smith's Deposition at 273:19-

274:4, attached Exhibit No. 9. Defendant admits that its managers acted inappropriately on June 21st, 2020. *Id.* at 152:9-17.

On May 3rd, 2022, Defendant's filed Defendant's Motion for Summary Judgment. See ECF No. 67. Defendant's motion seeks judgment on Plaintiffs' § 1981 claims. *Id.* Now, the pretext Defendant is asserting is that D.G. was improperly dressed because he was wearing basketball or athletic shorts.

## B.  LEGAL STANDARD

Defendant alleges that it is entitled to summary judgment on Plaintiffs' claims. Federal Rule of Civil Procedure 56(a) provides that summary judgment should only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". "A dispute is genuine if a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (*quoting Dulaney v. Packaging Corp. of America,* 673 F.3d 323, 330 (4th Cir. 2012). A fact is considered to be material if it "might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, *supra,* 477 U.S. at 248 (1986). In a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, *Tolan v. Cotton*, 572 U.S. 650, 656-657 (2014) and draw all reasonable inferences in the favor of the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003)(quoting *Drewitt v. Pratt*, 999 F. 2d 774, 778-779 (4th Cir. 1993).

## C. LEGAL ARGUMENT

### 1.  Defendant is not entitled to summary judgment on Plaintiffs' § 1981 claims.

42 U.S.C. § 1981 provides, in relevant part, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981 protects all persons from racial discrimination in making and enforcing contracts.  *Woods v. City of Greensboro*, 855 F.3d 639, 645 (4th Cir. 2017).

In order to establish a *prima facie* case under 42 U.S.C. § 1981 discrimination claim in a restaurant setting to establish a prima facie case of discrimination in a § 1981 cause of action relating to the purchase of goods or services, the plaintiffs must establish that: (1) they are members of a protected class; (2) they sought to enter into a contractual relationship with the defendant; (3) they met the defendant's ordinary requirements to pay for and to receive goods or services ordinarily provided by the defendant to other similarly situated customers; and (4) they were denied the opportunity to contract for goods or services that was otherwise afforded to white customers. *See Williams v. Staples, Inc.,* 372 F. 3d 662, 667-668 (4th Cir. 2004); see also *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001).

In the instant matter, Plaintiffs have met all the elements required to establish their  § 1981 discrimination claims. Plaintiffs have established a prima facie case for racial discrimination under § 1981. Plaintiffs are African-Americans and as such, are members of a protected class. See *Williams v. Staples*, *supra*, 372 F.3d at 668. Plaintiffs have also proven that they made themselves available to receive and pay for the dining services provided by Defendant on the date of the incident. See Exhibit No. 1 at 149:2-6; see also Exhibit No. 2 at 1:25-1:59. However, Plaintiffs were denied the privileges and benefits of Defendant's dining services while

non-members of the protected class were **not** denied those services. See Exhibit No. 2 at 1:25-

1:59, 2:23-4:23.

In conclusion, Plaintiffs have established a prima facie that Defendant enforced its dress

code in an unequal and racially discriminatory manner in violation of 42 U.S.C. §1981. Due to

the discriminatory manner in which Defendant enforced its dress code, Plaintiffs were denied the

benefits and privileges of Defendant's services based upon their race.

### a. **Plaintiffs have established that Plaintiff D.G. and the comparator were similarly situated at Ouzo Bay on June 21st, 2020.**

Defendant asserts that Plaintiff D.G. and the comparator were not similarly situated.

Defendant claims that D.G. was wearing active wear, basketball, or athletic shorts at Ouzo Bay.

However, it is Plaintiffs' position that D.G. was wearing casual shorts. Defendant's dress code is

vague and ambiguous and does not specifically prohibit D.G.'s clothing. D.G.'s shorts were not

active wear, basketball shorts, or athletic shorts.[1] Defendant has not produced any evidence to

prove that D.G.'s shorts were basketball shorts or athletic shorts to prove that they did not meet

the dress code. Defendant also asserts without any evidentiary support that D.G.'s shorts were

mesh. Even if Defendant did produce evidence that D.G.'s shorts were made of mesh,

Defendant's dress code did not specifically prohibit any type of fabric from being worn at Ouzo

Bay on June 21st, 2020. See Exhibit No. 9 at 68:14-21, 83:12-21.

Defendant's arguments are inconsistent with Defendant's prior statements about D.G.'s

wardrobe. Defendant's conduct indicates that Plaintiffs should have been served on June 21st,

2020. See Exhibit No. 8. After Defendant denied service to Plaintiffs, Defendant issued a public

---

[1] In fact, what are "basketball" shorts or "athletic" shorts? Are they shorts in which someone plays basketball or is involved in athletic activity. If those are the definitions then any kind of shorts can be considered "basketball" or "athletic shorts.

apology to Plaintiffs for the conduct of its managers. *Id.* Defendant's public statement admitted that Plaintiff D.G. and the white child were similarly dressed at the time of the incident. *Id.* As such, Defendant has seemingly admitted that Plaintiff D.G. and the comparator were similarly situated. Defendant's public statement also states the incident "should never have happened." *Id.*

A plaintiff is not required to identify a similarly situated white comparator to prove his/her discrimination claim. *See Bryant v. Aiken Regional Medical Centers,* 333 F.3d 536, 545-546 (4th Cir. 2003)*.* Courts may "infer discriminatory intent from evidence of a general pattern of racial discrimination in the practices of a defendant." *Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th Cir. 2017). However, when a plaintiff intends to rely on a comparator to establish circumstances giving rise to an inference of unlawful discrimination, "[t]he similarity between comparators ... must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, North Carolina,* 545 F.3d 260, 265 (4th Cir. 2008). "Overall, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Eaton v. Indiana Department of Corrections*, 657 F.3d 551, 556 (7th Cir. 2011) (internal quotation marks omitted). The plaintiff and the comparator do not have to be identical to be similarly situated. *Haynes v. Waste Connections, Inc.* 922 F.3d 219, 223 (4th Cir. 2019). Typically, the question of whether two individuals are similarly situated is a question for the jury. *Tinsley v. City of Charlotte*, 854 Fed Appx 495, 501 (4th Cir. 2021); see also *Parks v. Mid-Atlantic Terminal*, 2022 WL 1781259 at * 5 (citing *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2nd Cir. 2003)).

In the instant matter, Plaintiff D.G. was not wearing active wear or athletic shorts. Defendant has offered no proof during pretrial discovery. Defendant claims that Ms. Grant stated

that the comparator's shorts had buttons on them in an effort to make it seem that slight difference creates a substantial difference in dress between D. G. and the comparator. D.G. and the comparator were not identically dressed. The law is clear that D.G. and the comparator do not have to be identically dressed to be similarly situated. See *Haynes*, 922 F. 2d at 223. However, D.G. was similarly situated with the comparator. D.G. and the comparator both encountered Defendant's staff, were subject to the same dress code, and were similarly dressed. See Exhibit No. 2 at 1:19, 2:31, 2:35-2:39; see also Exhibit No. 8. Both D.G. and the comparator were wearing graphic t-shirts, shorts, and tennis shoes. See Exhibit No. 2 at 1:19, 2:31, 2:35-2:39. On the date of the incident, Defendant admitted that D.G. and the comparator were similarly dressed. See Exhibit No. 8. Nevertheless, Defendant still chose to deny Plaintiffs dining services at Ouzo Bay. Exhibit No. 1 at 167:1-3, 169:21-170:14.

Plaintiffs have presented sufficient evidence to establish a plausible basis for believing that Plaintiff D.G. and the comparator were similarly situated. Plaintiffs have clearly established the similarities and/or commonalities between D.G. and comparator. The question of whether Plaintiff D.G. and the comparator were similarly situated at the time of the incident is a question for the jury. In this case, a rational juror could find in favor of Plaintiffs on this issue.

**b.** **Plaintiff D.G. met the requirements for service at Ouzo Bay.**

Defendant contends that Plaintiff D.G. was wearing athletic wear and the comparator was not wearing athletic wear at the restaurant on the date of the incident. Defendant also contends that D.G.'s wardrobe was in violation of the dress code and as such, D.G. was denied dining services at Ouzo Bay.

In this matter, Plaintiff D.G. and the comparator were wearing similar clothing: graphic t-shirts, shorts, and tennis shoes. Plaintiff D.G. was wearing casual shorts on the day of the

incident. Defendant has presented no evidence D.G. was wearing mesh basketball or athletic shorts on the day of the incident. Defendant's is merely making conclusory allegations in support of its position. Moreover, Defendant has presented no evidence that D.G.'s shorts were made of mesh. The only difference between D.G. and the comparator on June 21st, 2020 were their skin color.

Defendant's argument is inconsistent with its prior position. Defendant failed to mention that on the date of the incident it publicly admitted that D.G. and the white child were similarly dressed when Plaintiffs were denied dining services. See Exhibit No. 8. Defendant also admitted that Plaintiffs should have been served at the Ouzo Bay Restaurant. *Id.* Defendant also apologized for denying service to Plaintiffs and wrote that the incident "should never have happened." *Id.*

It is important to note that Alex Smith with his attorney, Mr. Marder, personally reviewed and approved the content of Defendant's press release apology which included the admission that D.G. and the comparator were similarly dressed. See Exhibit No. 9 at 265:5-266:12. The press release reflected how Defendant felt at the time. *Id.* at 272:2-8. Importantly, Mr. Smith admitted that he and his attorneys reviewed the video prior to sending out Defendant's press release apology. *Id.* at 267:9-268:17.

After conceding that D.G. and comparator were similarly dressed, Defendant's employee, Joe Sweeney, contacted comparator's mother requesting her to "help" show that her child's shorts were "not athletic shorts". See Exhibit No. 9 at 216:2-8, 222:14-223:3. Any other position that Defendant takes on this issue is inconsistent with their prior position and should be considered self-conflicting.

In the instant matter, Plaintiffs met the requirements for dining services at Ouzo Bay Restaurant, but they were denied those services because of Defendant's pattern of discriminatory behavior. Defendant has exhibited a pattern of racial discrimination at Ouzo Bay and at its other restaurants. See Exhibit No. 3 at ¶¶ 2-14, ¶¶ 23-25, Exhibit No. 4 at ¶¶ 8-10, and Exhibit No. 5 at ¶¶11-16. Defendant's former employees, Jenna Burlakoti, Rafael Coppola, and Elizabeth Devine, witnessed black customers receive disparate treatment at Defendant's restaurants in comparison to its white customers. *Id.* Ms. Burlakoti, Mr. Coppola, and Ms. Devine witnessed Defendant's dress code enforced against black people in a racially discriminatory manner. *Id.* The incident involving Plaintiffs is simply another example of Defendant yet again enforcing its dress code in a racially discriminatory manner against black customers. This is the reason Defendant apologized to Plaintiffs and explains why Mr. McCafferty was terminated and why Mr. Petit was forced to leave the company. See Exhibit No. 6 at 56:11-57:8, 58:1-12 and see also Exhibit No. 8. In fact, there were people in the restaurant who were wearing the same or similar attire as D.G when he was being denied service. See Exhibit No. 2 at 2:01-2:13.

In conclusion, Plaintiffs met the requirements for service at Ouzo Bay. Plaintiffs were properly dressed and met the requirements for service. But for their race, Plaintiffs would have been permitted to dine at Ouzo Bay. A rational juror could find that Plaintiffs met the requirements for service.

### c.  **The video does not tell the whole story of the incident.**

Defendant asserts that Plaintiff cannot rebut the video. Defendant claims the video establishes that Plaintiff D.G. and the comparator were not similarly dressed, and shows that they were dressed was significantly different. Moreover, Defendant also alleges that D.G. was

wearing mesh basketball shorts and as a result, violated Defendant's dress code. Lastly, Defendant contends that Plaintiffs has not presented any racial animus to prove their claims.

As to these issues, the video does not support Defendant's claim that there was no racial animus nor does the video prove that D.G and the comparator were dressed significantly different. The video does establish that there were people dining in the restaurant who were wearing the same or similar attire as D.G. See Exhibit No. 2 at 2:01-2:13. However, the video does not put the entire incident into context. In fact, the video establishes only a small part of Plaintiffs' claims.

The video does not capture Defendant's history of improperly and unequally enforcing its dress code against black customers and people of color. The instant case is just an example of that discrimination. Defendant's former employees, Jenna Burlakoti, Elizabeth Devine, Rafael Coppola, and Henry Walters have presented significant evidence of Defendant's negative attitudes towards black people and how it enforced its dress code in an unequal and racially discriminatory manner that excluded black people. The disparate treatment of black people occurred regularly and maybe even on a daily at Defendant's restaurants. See Exhibit No. 7. Mr. Walters noticed the disparate treatment of black guests at Ouzo Bay before June 21st, 2020. *Id.* This was the reason Mr. Walters wanted to have a meeting with Defendant's management to express his concerns regarding the dress code. See Exhibit No. 6 at 114:1-115:10; see also Exhibit No. 7.

On June 21st, 2020, when Plaintiffs walked into Ouzo Bay, Ms. Grant noticed that about thirty percent (30%) of the customers in the restaurant at that time were black. See Ms. Grant's Declaration, at ¶ 5, attached as Exhibit No. 10. At that time, Plaintiffs did not know about Defendant's history and pattern of unequal enforcement of its dress code against black

customers. See Exhibit No. 1 at 139:2-6. When D.G. entered Ouzo Bay, he and the comparator were similarly dressed. By defendant's own admission, on the date of the incident, Defendant issued a public statement stating that D.G. and the comparator were similarly dressed. See Exhibit No. 8. Now, Defendant is choosing to ignore its admission and prior statement. In fact, Defendant's current argument is inconsistent with its prior statement.

Both D.G. and the comparator were dressed in graphic t-shirts, shorts, and tennis shoes. See Exhibit No. 2 at 1:19, 2:31, 2:35-2:39. There is nothing in the video that indicates that D.G.'s shorts were made of mesh or were basketball shorts or athletic shorts. *Id.* Defendant is simply jumping to conclusions and making conclusory statements that D.G was wearing basketball shorts or athletic shorts. Defendant also claims that Plaintiff's basketball shorts were made of mesh. Again, Defendant has presented no evidence that supports its allegation. Furthermore, even if D.G.'s shorts were made of mesh, there is nothing in Defendant's dress code that prohibits any specific type of fabric, including mesh. See Exhibit No. 9 at 83:12-21.

In the instant matter, Defendant's claim that D.G. and the comparator were not similarly dressed is inconsistent with its statement of June 21st, 2020. Moreover, Defendant's claim that D.G was wearing mesh basketball or athletic shorts is a conclusory statement without any evidentiary support. These issues are issues that must be determined by a trier of fact. A reasonable jury could find for Plaintiffs on these issues. There are genuine disputes of material fact on these issues and as such, in the light most favorable to Plaintiffs and with all reasonable inferences in favor of Plaintiffs, a jury must decide whether D.G. was wearing basketball or athletic shorts on the date of the incident and whether D.G. and comparator were similarly dressed and were similarly situated on June 21st, 2020.

**d. Plaintiffs have met the "but for" cause standard to establish racial discrimination by Defendant.**

Defendant claims that Plaintiffs failed to prove "but for" causation to sustain their §1981 discrimination claims. Defendant's motion failed to acknowledge or has chosen to ignore important facts in its arguments.

Plaintiffs have produced a mountain of evidence in support their claims that Defendant violated 42 U.S.C. §1981. Plaintiffs have established that they were not granted permission to dine at Ouzo Bay and were turned away because of their race. Plaintiffs have established sufficient facts to establish that "but for" their race they would have been permitted to dine at Ouzo Bay.

On June 21st, 2020, Defendant enforced its dress code against Plaintiffs in a racially discriminatory manner. But for their race, Plaintiffs would have enjoyed the privileges and benefits of dining at the Defendant's restaurant and would not have sustained a loss of a legally protected right. Plaintiff D.G. and the comparator were similarly situated on June 21st, 2020. See Exhibit No. 2. They were at the same restaurant, on the same day, at the same time. Defendant's manager encountered both Plaintiff D.G. and the comparator. See Exhibit No. 1 at 162:7-12, 163:13-15; see also Exhibit No. 2. Both Plaintiff D.G. and the comparator were both dressed in shorts, graphic t-shirts, and tennis shoes at the time. See Exhibit No. 2 at 1:19, 2:31, 2:35-2:39. Moreover, they both appear similar in age. *Id.* at 2:35-2:39, 3:00-3:02. As African-Americans, Plaintiffs went to Ouzo Bay for purposes of dining. See Exhibit No. 1 at 149:2-9. However, they were denied dining services. *Id.* at 167:1-3, 169:21-170:14. The comparator was not denied those services. See Exhibit No. 2 at 2:35-2:39. Plaintiffs have proven that they were denied a legally protected right that the comparator was not denied. See Exhibit No. 2.

Defendant claims it did not deny Plaintiffs entry into the restaurant because of their race, but because D.G. was not appropriately dressed. Defendant's assertion is merely a pretext. Defendant's claim is false. Defendant's current position is wholly inconsistent with its public statement regarding Plaintiffs. Defendant has failed to recognize that it previously admitted that Plaintiff D.G. and the comparator were similarly dressed. See Exhibit No. 8. Defendant also wrote that Plaintiffs should have been served at the restaurant and that Defendant apologized for what happened to Plaintiffs. *Id.* Defendant also admitted that its employees acted inappropriately on June 21st, 2020. See Exhibit No. 6 at 28:2-7; see also Exhibit No. 9 at 152:9-17.  In fact, Ms. East, Defendant's Vice President of Human Resources, called the conduct of Ouzo Bay's managers on the day of the incident "egregious". See Exhibit No. 6 at 28:2-7. Defendant's management team also chastised and terminated and/or separated from the managers who denied Plaintiffs the right to dine at Ouzo Bay. *Id.* at 56:11-57:8, 58:1-12.

Defendant has a pattern of discriminatory behavior toward African-Americans customers. Historically, Defendant has enforced its dress code unequally and in a racially discriminatory manner against its black customers. Ms. Burlakoti, Defendant's former employee, was employed as a server at the Loch Bar from June 2020 to July 2020. See Exhibit No. 3 at ¶ 2. The Loch Bar is a restaurant owned and/or managed by the defendant. *Id.* at ¶ 4. Ms. Burlakoti noticed that Defendant's managers had negative attitudes toward black customers. *Id.* at ¶ 5. During her time as a server, she witnessed Defendant apply its dress code in a racially discriminatory manner. *Id.* at ¶ 25.

About a week before the incident involving Plaintiffs, Ms. Burlakoti's friend, an African-American female, came into the Loch Bar to visit Ms. Burlakoti. *Id.* at ¶¶ 6-7. Ms. Burlakoti's friend came into the restaurant and sat at the bar around 3:00 p.m. *Id.* at ¶ 7. She ordered a drink

and an appetizer. *Id.* at ¶ 8. At that time, Defendant's manager came over to the bar and advised Ms. Burlakoti's friend that she had to leave the restaurant because she was not properly dressed. *Id.* at ¶ 11. However, the sign in the restaurant indicated that the dress code at the restaurant did not start until 5:00 p.m. *Id.* at ¶ 16. As such, there was no dress code to be enforced at the time. *Id.* Ms. Burlakoti informed her manager that there was no dress code to be enforced. *Id.* at ¶ 12. Nevertheless, the Loch Bar's manager told her that the dress code was starting at 3:00 p.m. that day. *Id.* at ¶13. There was no other reason than Ms. Burlakoti's friend's race as why she was denied service that day. *Id.* at ¶ 15. This is just another example of how Defendant chooses to apply its dress code in a racially discriminatory matter. Ms. Burlakoti reported the incident to upper management. See Exhibit No. 9 at 153:4-155:2.

Ms. Burlakoti also witnessed other racially discriminatory acts at the Loch Bar restaurant. *Id.* at ¶¶ 18-23. During her time as a server, there was a time when frozen rose drinks became popular among black influencers at the Loch Bar. *Id.* at ¶ 18. At that time, managers of the Loch Bar created false reasons as to why they could not serve the black customers the frozen rose drink. *Id.* at ¶¶ 20-21. Ms. Burlakoti knew the reasons the managers were giving the black customers were not true. *Id.* at ¶ 21. She knew the reason why the Loch Bar managers did not serve the frozen rose drinks to the black customers was because the color of their skin.

Mr. Coppola was Defendant's employee at Ouzo Bay on the day Plaintiffs were denied service. Exhibit No. 4 at ¶¶ 3, 8. Mr. Coppola was working as a server at the Ouzo Bay on June 21st, 2020. *Id.* at ¶ 8. Mr. Coppola was working as a server when Plaintiffs entered the restaurant. *Id.* Mr. Coppola was the server who served the comparator's table. *Id.* Mr. Coppola saw up close how Plaintiff D.G. and the comparator were dressed. *Id.* Mr. Coppola saw that Plaintiff D.G. and the comparator were similarly dressed. *Id.* at ¶ 9. Mr. Coppola believed that the behavior of

Eric Petit, Defendant's manager, was wrong that day. *Id.* at ¶ 10. Mr. Coppola had an open table in his area on the patio that day. *Id.* Therefore, there was a table available for Plaintiffs to dine had they been permitted to dine. *Id.*

While Mr. Coppola was a server at Ouzo Bay, he witnessed Defendant's employees engage in other racially discriminatory behavior. *Id.* at ¶ 11. Mr. Coppola observed an employee avoid serving a black couple and serve a white couple. *Id.* Mr. Coppola informed his manager of the disparate treatment of the black customers. *Id.* Mr. Coppola's employment was terminated when he reported the racial discrimination to management. *Id.* Mr. Coppola also witnessed other acts of discrimination during his employment at the Ouzo Bay Restaurant. *Id.* at ¶ 12.

Another of Defendant's former employees, Elizabeth Devine, also witnessed the disparate treatment of African-Americans at another of Defendant's restaurants. See Ms. Devine's Declaration, at ¶¶ 2, 3, 4, attached as Exhibit No. 5. Ms. Devine was a server at Azumi from August 2019 to April 2020. *Id.* at ¶ 3. Ms. Devine witnessed black customers and other people of color being treated differently than white customers. *Id.* at ¶¶ 8-9. Ms. Devine observed Defendant's dress code was being enforced unequally and in a discriminatory manner against black people and other people of color. *Id.* at 11, 15, 16. Ms. Devine saw Defendant's employees were on higher alert when people of color came into the restaurant. *Id.* at ¶ 15. Ms. Devine also noticed that Defendant's employees were also quicker to take action to enforce the dress code against people of color than white people. *Id.* at ¶ 16. She also noted that Defendant's employees inconsistently enforced the dress code. *Id.* at ¶ 11.

After June 21st, 2020, Ms. Burlakoti and another former employee, Henry Walters, went to see Alex Smith about Defendant's dress code and its enforcement against people of color. See Exhibit No. 6 at 115:3-12. Ms. Burlakoti and Mr. Walters are two (2) employees from two (2)

different restaurants, who went to see Mr. Smith regarding the dress code and how it
discriminated against and excluded black customers. *Id.* at 114:1-115:10. Mr. Walters, who was
employed at Ouzo Bay when Ms. Grant was denied service, recognized the disparate treatment
of black guests due to the dress code. See Exhibit No. 7. Mr. Walters recognized the disparate
treatment of black people occurred regularly and may be even daily at Ouzo Bay and
Defendant's other restaurants. *Id.*

Ms. Burlakoti, Mr. Coppola, Ms. Devine, and Mr. Walters witnessed first-hand the
interaction of Defendant's employees and black customers as well as how Defendant's dress
code was being enforced against Defendant's black people. Ms. Burlakoti, Mr. Coppola, Ms.
Devine, and Mr. Walters also observed the racially discriminatory enforcement of Defendant's
dress code against black people as well as the negative attitude exhibited by Defendant's
employees toward black customers.

Defendant and its management oversaw a pattern of discrimination at Ouzo Bay, the
Loch Bar, and Azumi. The conduct of Defendant's managers on June 21st, 2020 was not an
isolated incident. In fact, Defendant admitted that between twenty (20) and fifty (50) of its
employees have been terminated for racial discrimination. See Exhibit No. 9 at 195:5-196:8.

Defendant claims that its dress code was strictly enforced on June 21st, 2020. *Id.* at 83:22-
84:4. Plaintiffs have proven that Defendant's dress code was not equally enforced. See Exhibit
No. 3 at ¶¶ 2-14, 23-25; see also Exhibit No. 4 at ¶¶ 8-10; see also Exhibit No. 5 at ¶¶ 11-16.
Moreover, Defendant's dress code was also not consistently enforced at all of its restaurants. See
Exhibit No. 5 at ¶¶ 11, 12. Defendant has presented inconsistent arguments concerning the
enforcement of its dress code. Defendant claims that its dress code was being properly enforced
by Defendant's management on June 21st, 2020. But Defendant has admitted that D.G. and the

comparator were similarly dressed when they were denied service and that Plaintiffs should have been served. See Exhibit No. 8. Defendant also apologized for the behavior of its' employees on the day of the incident. *Id.* Defendant also terminated and/or agreed to part ways with its managers, Mr. McCafferty and Mr. Petit, due to their improper conduct on June 21st, 2020. See Exhibit No. 6 at 56:11-57:8, 58:1-12. Ms. East called Mr. McCafferty's and Mr. Petit's conduct "egregious". *Id.* at 28:2-7.

Defendant's statement and the actions of its employees are not the statement and actions of a defendant that acted appropriately under the circumstances. See Exhibit No. 8. Defendant's prior statement, conduct of its employees, and testimony of its current and former employees are inconsistent with Defendant's current arguments that Plaintiffs should have been denied service.

Defendant's claim that Plaintiffs were properly denied service on a non-discriminatory basis is false and is merely a pretext in an effort to explain away Defendant's pattern of negative attitudes and discriminatory behavior towards black people and other people of color. Defendant's current and former employees witnessed first-hand how Defendant enforced its dress code against black people and people of color in a racially discriminatory manner at its restaurants.

In conclusion, on June 21st, 2020, Plaintiff D.G. and the comparator were similarly situated. The only difference between D.G. and the comparator were their race. Accordingly, but for Plaintiffs' race, they would have been served at Ouzo Bay on June 21st, 2020 and would not have been denied a legally protected right under § 1981. Based upon all the evidence, a rational trier of fact could find for Plaintiffs on this issue. Accordingly, in the light most favorable to the non-moving party, Plaintiffs have met the "but for" cause to establish racial discrimination and as such, Defendant's Motion for Summary Judgment must be denied.

**e. Defendant cannot rebut their statements and its employees' statements and actions.**

Defendant's motion contains arguments and conclusions that are wholly inconsistent with the prior conduct and testimony of its current and former employees.

Defendant claims that Plaintiff D.G. was not similarly situated with the comparator. However, Defendant's public statement on day of the incident stated that Plaintiff D.G. and the comparator were similarly dressed. See Exhibit No. 8. Moreover, Defendant apologized to Plaintiffs and terminated and/or separated from its former managers, Mr. McCafferty and Mr. Petit, related to their conduct on June 21st, 2020. See Exhibit No. 6 at 56:11-57:8, 58:1-12. Ms. East called Mr. McCafferty's and Mr. Petit's conduct toward Plaintiffs "egregious". See Exhibit No. 6 at 28:2-7. Ms. East testified in her deposition that Mr. McCafferty's and Mr. Petit's actions were so "egregious" that "we did not have a need to interview other Atlas employees because we already knew what we were going to do." *Id.* Defendant's statement called the incident "disturbing", and went on to say that it was "sickened by the incident." See Exhibit No. 8.

Now, conversely, Defendant is seemingly arguing that Mr. McCafferty's and Mr. Petit's actions were not "egregious", but were seemingly appropriate under the circumstances. Clearly, Defendant is now taking a different position. Defendant argues that Plaintiffs should have been denied dining services at Ouzo Bay on June 21st, 2020 because D.G. did not meet the dress code requirements. Defendant's corporate designee, Alex Smith, testified that the dress code was to be strictly enforced on June 21st, 2020. See Exhibit No. 9 at 83:22-84:4. However, Defendant's public statement rebuts Mr. Smith's testimony that the dress code was to be strictly enforced. See Exhibit No. 8. Defendant's statement addressed the dress code when it stated that "[f]rom a management perspective, there is a level of … discretion… we expect, and this incident will

serve a teachable moment to ensure it is not repeated." Defendant also apologized to Plaintiffs and wrote that they "deserved better".

Defendant's public statement indicates that there is a level of management discretion when enforcing the dress code. *Id.* The language contained in Defendant's statement supports the positions taken by Ms. Burlakoti, Ms. Devine, and Mr. Walters.

Ms. Devine observed people of color being treated differently based upon their race. See Exhibit No. 5 at ¶ 7. She noticed people of color being turned away and being treated differently than white people. *Id.* at ¶ 8. Ms. Devine did not observe the dress code being strictly enforced by its managers, but saw that the dress code being inconsistently enforced by management. *Id.* at ¶ 11. The consistency of dress code enforcement depended upon the manager. *Id.* Finally, Ms. Devine also noticed that Defendant's employees were on higher alert and were quicker to enforce its dress code against people of color than white people. Id. at ¶¶ 15, 16. Clearly, Defendant's public statement and Ms. Devine's observations indicate that Defendant had discretion in enforcing the dress code and that it was not being strictly enforced as Mr. Smith claims. Defendant's statements, actions, and testimony are clearly inconsistent with its current position.

Defendant claims that its dress code was not enforced against black people in a discriminatory manner. However, Jenna Burlakoti, Henry Walters, and Elizabeth Devine, who were employed by Defendant, witnessed the dress code being inconsistently enforced by management and being unequally enforced and in a racially discriminatory manner against black people. This is why Ms. Burlakoti and Mr. Walters met with Defendant's management about Defendant's dress code and how its dress code discriminated against and excluded black people

regularly and may be even daily. See Exhibit No. 7. Consequently, after the incident, Defendant decided to revise its dress code. See Exhibit No. 9 at 273:19-274:10.

In conclusion, Defendant's current arguments are inconsistent with its public statement, the testimony of its current and former employees, and conduct of its employees. Defendant's inconsistent statements, and the testimony, and conduct of Defendant's current and former employees have created a genuine dispute of material fact. Accordingly, Defendant's Motion for Summary Judgment must be denied.

### f. Plaintiffs suffered harm related to the incident of June 21st, 2020.

Defendant asserts that Plaintiffs have not suffered harm related to the incident of June 21st, 2020. Defendant seemingly argues that Plaintiffs must present an expert witness and expert testimony related to their pain and suffering. This is not the correct interpretation of the law.

Plaintiffs may recover compensatory and punitive damages pursuant to their §1981 claims. See *Johnson v. Railway Express Agency*, 421 U.S. 454, 459-460, 95 S.Ct. 1716, 1720 (1975). Plaintiffs may recover general compensatory damages under §1981 for emotional pain and suffering, inconvenience, suffering, mental anguish, and other non-pecuniary losses. See 42 U.S.C. §1981(3); see also 42 U.S.C. § 1981(1); see also *Gunby v. Pennsylvania Electric Company*, 840 F.2d 1108, 1121-1122 (3rd Cir. 1988). Plaintiffs may also recover punitive damages under § 1981. See 42 U.S.C. § 1981 (b)(1).

The law is clear that Plaintiffs are not required to present expert testimony related to their emotional pain. In federal court, Rule 702 of the Federal Rules of Evidence governs expert testimony. Rule 702 allows for expert testimony if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue". Expert testimony would assist a trier of fact "[w]hen emotional distress is unusually

severe or alleged in clinical terms, or when another party intends to offer expert testimony about

the distress, the testimony of an expert would help the trier of fact understand the nature,

severity, and characteristics of the emotional distress." However, expert testimony is not required

when "[a] trier of fact… does not need help when understanding ordinary grief, anxiety, anger,

frustration that any person would feel when something bad happen occurs". See *Ricks v. Abbott*

*Laboratories*, 198 F.R.D. 647, 649 (2001). This is "[b]ecause laypersons can understand this

kind of ordinary emotional distress without the help of an expert, there is no need for an expert to

conduct a mental examination of the plaintiff who claims only ordinary and uncomplicated

emotional distress." *Id.*

In the instant matter, Plaintiff Grant has testified that her emotional pain and suffering is

limited to her dealing with D.G.'s emotions and anger related to the incident with the defendant.

See Exhibit No. 1 at 212:21-213:4. Plaintiff Grant's damages are related to her emotional

struggles in dealing with D.G.'s emotions and anger. *Id.* at 213:15-18. D.G.'s damages are not of

the severity that requires expert testimony. D.G.'s emotional injuries as ordinary emotional

injuries such as anger and irritability. *Id.* at 213:3-9

Plaintiffs have not been diagnosed with a specific type of emotional injuries by a medical

expert nor are they claiming those type of damages. Plaintiffs' emotional damages are of the

ordinary kind of anger and/or frustration. Plaintiff's emotional damages are not complex and as

such, expert testimony would not be necessary to assist the trier of fact in understanding their

emotional injuries and damages.

Defendant also claims that D.G. had a lot of other things going on in his life that could

affect upon his amount of damages. However, Defendant's argument goes to the weight of the

evidence and does not address the need or requirement for expert testimony. This type of

evidence is to be considered by the trier of fact when deciding upon the amount of damages to award Plaintiffs. Accordingly, Defendant's claim that Plaintiffs have not suffered harm is not correct and as a result, Defendant's motion must be denied.

### g. Plaintiffs are entitled to punitive damages in this case.

Defendant claims that Plaintiffs are not entitled to punitive damages because they have no compensatory damages. Defendant's argument is flawed because Plaintiffs have established that they suffered compensatory damages.

In the instant matter, Plaintiff are entitled to punitive damages because they are entitled to compensatory damages for emotional pain and suffering, inconvenience, mental anguish, and other non-pecuniary losses that they sustained that are recoverable under § 1981(b)(1).

Plaintiffs may recover punitive damages under § 1981. "Punitive damages are limited to cases in which the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." See 42 U.S.C. § 1981(b)(1); see also *Kolstad v. American Dental Association*, 527 U.S. 526, 529-530 (1999). "The terms 'malice' and 'reckless' ultimately focus on the actor's state of mind," and "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 535. "While egregious misconduct is evidence of the requisite mental state, § 1981a does not limit plaintiffs to this form of evidence, and the section does not require a showing of egregious or outrageous discrimination ..." *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 441-442 (4th Cir. 2000) (quoting *Kolstad*, 527 U.S. 526, 536).

In order to succeed in a claim for punitive damages, a plaintiff must prove: "(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the

23

principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or managerial agent of the principal ratified or approved the act." See *Kolstad*, 527 U.S. at 542-543; see also Restatement Second of Torts § 909; see also *Williams v. Cloverland Farms Dairy, Inc.*, 78 F.Supp. 479, 486 (1999).

In the case at bar, Defendant claims that it maintained a dress code that its employees enforced. Defendant also claims that its managers did not act with malice or in a racially discriminatory manner. However, Plaintiffs have met the elements required to sustain its claim for punitive damages.

Plaintiffs have proven that Defendant's upper management, Mr. Smith, authorized his managers to strictly enforce Defendant's dress code at the Ouzo Bay Restaurant on June 21st, 2020. See Exhibit No. 9 at 83:22-84:4. Mr. Smith testified that the dress code was to be strictly enforced. *Id.* Defendant's management authorized the manner in which the dress code was to be enforced. *Id.* Defendant's managers, Mr. McCafferty and Mr. Petit were the managers who were working within the scope of their employment on June 21st, 2020. See Exhibit No. 2 at 1:28-1:59, 2:23-4:23. They enforced the dress code at Ouzo Bay. *Id.*

In the instant matter, Plaintiffs have produced evidence that Defendant's managers enforced the dress code unequally and in a racially discriminatory manner that excludes and discriminates against black customers and people of color. See Exhibit No. 3 at ¶¶ 2-14, ¶¶ 23-25, Exhibit No. 4 at ¶¶ 8-10, and Exhibit No. 5 at ¶¶ 11-16. Defendant's management was advised of the complaints of racism that have been made against the company. See Exhibit No. 9 at 122:19-123:9. In fact, two of its former employees, Jenna Burlakoti and Henry Walters spoke with Mr. Smith regarding how Defendant's dress code was enforced in a racially discriminatory

manner against black people and people of color. Defendant has also terminated between twenty
(20) and fifty (50) people of its employees for racial discrimination. *Id.* at 195:5-196:8.
Defendant's management was aware of the complaints of racism against the company on June
21st, 2020. Defendant knew or should have known the manner in which they chose to enforce the
dress code could be violating federal law but Defendant chose to continue its manner of conduct.
Defendant had knowledge that it may be violating federal law and engaging in racial
discrimination. See Exhibit No. 7; see also Exhibit No. 9 at 122:19-123:9, 124:17-21. In fact, Mr.
Walters informed Defendant's management that it was known to him and Defendant's other
employees that Defendant's dress code was used to disparately treat black guests. See Exhibit
No. 7. This was known to Defendant for before the incident with Ms. Grant. *Id.* However,
Defendant's management chose not to do anything about it. *Id.* Instead, Defendant chose to
continue to enforce its dress code in an unequal and discriminatory manner against black people.

On June 21st, 2020, Defendant was finally forced to address the complaints of racial
discrimination due to Plaintiffs' claims. See Exhibit No. 8. At that time, Defendant was finally
forced to address the conduct of its restaurant managers. *Id.* When Defendant was required to
address the conduct of its managers, Defendant's Vice-President of Human Resources, Julie
East, described the conduct of Mr. McCafferty and Mr. Petit in their interaction with Plaintiffs as
"egregious". See Exhibit No. 6 at 28:2-7.

In conclusion, Plaintiffs have met the elements required to sustain their claims for
punitive damages. Accordingly, Defendant's Motion for Summary Judgment related to
Plaintiffs' claims for punitive damages must be denied.

## D.  **CONCLUSION**

For all the forgoing reasons, there exists a genuine dispute of material fact and in the light most favorable to Plaintiffs, a rational trier of fact could find in favor of Plaintiffs and based on the evidence find that Defendant discriminated against Plaintiffs due to their race. Accordingly, Defendant's Motion for Summary Judgment must be denied.

Respectfully Submitted,

_____/s/_____
Joseph E. Spicer, Esquire #27839
Cohen Harris, LLC
40 York Road, 4th Floor
Towson, Maryland 21204
Telephone No.: (888) 585-7979
Fax No.: (443) 773-0675
E-mail: joseph@cohenharris.com
Attorney for Plaintiffs

_____/s/_____
Donte O. Mills, Esquire (appearing pro hac vice)
Lennon Edwards, Esquire (appearing pro hac vice)
Mills & Edwards, LLP
14 Penn Plaza, 20th Floor
New York, New York 10122
Telephone No.: (212) 635-2969
Fax No.: (212) 635-2905
E-mail: dmills@melawny.com
E-mail: ledwards@melawny.com
Attorneys for Plaintiffs

**REQUEST FOR HEARING**

Plaintiffs request a hearing on Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at the earliest possible date and time.

_____/s/_____
Joseph E. Spicer, Esquire #27839


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of February 2023, Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment was filed and served via CM/ECF.

_____/s/_____
Joseph E. Spicer, Esquire #27839